UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| AMEREN MISSOURI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11 CV 02051-AGF |
| | ) | |
| UNITED STATES ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |

LOCAL RULE 7-4.01 STATEMENT OF UNCONTROVERTED
MATERIAL FACTS IN SUPPORT OF
DEFENDANT ENVIRONMENTAL PROTECTION AGENCY'S
CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant, the United States of America, acting on behalf of the United States

Environmental Protection Agency ("EPA"), submits the following statement of undisputed

material facts in support of its Cross-Motion for Summary Judgment pursuant to Local Rule

7-4.01(E) of this Court and also responds to the facts provided by plaintiff Ameren-Missouri's

("Ameren") cross-motion for summary judgment.

I.      EPA's Response To Ameren's Facts.

1.      Ameren operates four coal-fired electric generating power plants located in

Missouri, known as the Labadie, Meramec, Rush Island and Sioux plants (hereinafter, the

"Plants"). *See* Ameren's Exhibit 1 to Ameren's Motion at 52[1].

EPA Response: Admitted.

2.      Defendant United States Environmental Protection Agency ("EPA") is an agency

---

[1]All references to exhibits labeled with numbers refer to Ameren's exhibits in support of
Ameren's motion for summary judgment.

of the United States within the meaning of 5 U.S.C. § 552(f) and has possession of and control

over the records that Ameren seeks and that are the subject of this lawsuit.  *See* Exhibit 2 at ¶ 2.

**EPA Response**: Admitted.

3.      On January 26, 2010, EPA issued a Notice of Violation ("NOV") of the CAA to

Ameren pursuant to Section 113(a)(1) of the CAA, 42 U.S.C. § 7413(a)(1).  *See* Exhibit 3.  EPA

issued amended NOVs on October 13, 2010, and May 27, 2011 (collectively, the "NOVs").  *See*

Exhibits 4 and 5, respectively.

**EPA Response**: Admitted, except the correct date is October 14, 2010.

4.      In the NOVs, EPA found, in part, that Ameren undertook forty-eight (48)

"physical changes or changes in the method of operation" (hereinafter "projects") at its Plants

between 1985 and 2010 (hereinafter, the "Projects") in violation of the Prevention of Significant

Deterioration ("PSD") and Nonattainment New Source Review ("NNSR") provisions of the

CAA.  42 U.S.C. §§ 7470-92.  *See* Exhibit 5 at ¶¶ 53-56.  More specifically, the NOVs allege

certain administrative "Finding of Violations" that:

> [t]he activities described in Paragraphs 53 through 56, are major modifications
> that caused a significant net emissions increase of S02, NOx, PM, ozone, and/or
> PM2.5 within the meaning of the Clean Air Act… Ameren Missouri failed to
> apply for or obtain a PSD or NNSR permit prior to commencing construction of
> such activities. Ameren Missouri violated and continues to violate Sections 165(a)
> and 173 of the Act, 42 U.S.C. §§ 7475(a) and 7503... by commencing construction
> of, and continuing to operate, a major modification at the Labadie, Meramec,
> Rush Island and Sioux Plants without applying for and obtaining a PSD/NNSR
> permit….
>
> *See* Exhibit 5 at ¶58.

**EPA Response**: EPA admits that it issued NOVs to Ameren, and that Ameren's motion contains
copies of these NOVs.  EPA denies that any NOV constituted a final agency action.  NOVs are
not final agency actions.  *Union Electric Co. v. EPA*, 593 F.2d 299 (8th Cir. 1979).  "[N]o legal

consequences flow from the issuance of the NOV because it merely notifies plaintiffs of their existing obligations under the CAA." *Royster-Clark Agribusiness, Inc. v. Johnson*, 391 F. Supp.2d 21 (D.D.C. 2005). The Declaration of Mark Smith, Exhibit H hereto, places in the issuance of the NOVs in their proper legal and factual context at ¶¶ 5-20.

5.      In the NOVs, EPA did not provide the amount of any alleged emissions increases or the calculations, methods, or data that EPA used to make its alleged administrative findings that the Projects resulted in significant emissions increases. *See* Exhibit 3 at ¶¶ 49 - 61, Exhibit 4 at ¶¶ 49-61, and Exhibit 5 at ¶¶ 49-61.

**EPA Response**: EPA admits that the NOVs did not provide Ameren with privileged material or discuss all of the documents prepared by the agency during its investigation of Ameren's Clean Air Act compliance status, but denies that the NOVs constitute final agency action. EPA incorporates its response to ¶ 4 as a response hereto.

6.      In accordance with Securities and Exchange Commission requirements, Ameren has disclosed the issuance of the NOVs in its recent 10-Q SEC filing. *See* Exhibit 1 at 52-53.

**EPA Response**: Denied in part. EPA admits that Ameren chose to put the NOVs in its SEC filing. EPA is without knowledge or information sufficient to form a belief as to whether that disclosure was in accordance with the Securities and Exchange Commission's legal requirements.

7.      Ameren submitted a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et seq. to EPA on July 1, 2011. (Request No. 07-FOIA-0049-11). *See* Exhibit 6.

**EPA Response**: Admitted.

8.      Ameren requested that EPA produce "[a]ll documents and information that discuss or memorialize the emission calculations performed or used in connection with USEPA's findings that the physical changes or changes in the method of operation identified in the NOVs constituted major modifications that cause a significant emissions increase and a significant net emissions increase of sulfur dioxide, nitrogen oxide, particulate matter, particulate matter less

than 2.5 micrometers in diameter and/or ozone." (hereinafter, the "Request.").  *See* Exhibit 6 at 1.

**EPA Response**: Admitted.

9.      EPA responded to Ameren's Request by letter dated July 28, 2011 ("First

Response").  *See* Exhibit 7.

**EPA Response**: Admitted.

10.      EPA's First Response stated that EPA had possession of "approximately 100

spreadsheets and 45 other documents" responsive to Ameren's Request.  *See* Exhibit 7 at 1.  EPA

refused to produce any of the responsive documents, stating that it had determined that all of the

responsive documents were exempt from mandatory disclosure under Exemption 5 and

Exemption 7(A) of FOIA.  5 U.S.C. §§ 552(b)(5), (b)(7)(A).  *Id.*

**EPA Response**: EPA admits that it had possession of responsive documents and further that it

properly withheld some responsive documents from production under the provisions of the

Freedom of Information Act, as explained in Exhibit H hereto, the declaration of Mr. Mark

Smith, and denies the remainder of this paragraph.

11.      EPA's complete justification in its First Response for not producing any of the

responsive documents was as follows:

> "The documents you requested clearly meet both exemptions 5 and 7(A).
> Exemption 5 applies because these documents are attorney-client privileged
> communications.  Furthermore, they are also documents that were prepared at the
> time at the direction of EPA and DOJ attorneys in anticipation of litigation and are
> therefore attorney work-product.  Exemption 7(A) applies because these records
> were compiled for the enforcement purposes of investigating the compliance
> status of a facility with the New Source Review requirements of the Clean Air
> Act.  The documents you request contain confidential information, the release of
> which will prematurely reveal evidence or strategy in an ongoing case.  Therefore,
> the production of these documents could reasonably be expected to interfere with
> ongoing enforcement proceedings."

*See* Exhibit 7 at 1.

**EPA Response**: EPA admits that Exhibit 7 of Ameren's Statement of Facts contains one of the agency's many responses to Ameren's FOIA request but denies the remainder of this paragraph. EPA denies that this response was constitutes the only justification provided by the agency for withholding documents, and refers Ameren to Exhibit H hereto, the declaration of Mark A. Smith, and its cross-motion for summary judgment as the "complete justification" for its FOIA decisions.

12.     In the First Response, EPA did not provide a specific description of the documents being withheld or an index identifying the particular FOIA exemption upon which EPA based its determination to not disclose each responsive document. *See* Exhibit 7 at 1.

**EPA Response**: Denied.  EPA incorporates its response to ¶ 11 as a response hereto.

13.     Nor in the First Response did EPA provide a *Vaughn* index (*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)) that explained why Exemption 5, Exemption 7(A) or both protected each of the withheld documents from disclosure. *See* Exhibit 7 at 1.

**EPA Response**: Denied.  EPA incorporates its response to ¶ 11 as a response hereto, and specifically denies that a Vaughn index is required in this case.

14.     Ameren timely filed an administrative appeal of EPA's denial of Ameren's Request in the First Response on August 16, 2011 (the "Appeal"). *See* Exhibit 8.

**EPA Response**: Admitted.

15.     EPA responded to Ameren's Appeal by letter dated September 16, 2011 ("Second Response"). *See* Exhibit 9.

**EPA Response**: Admitted.

16.     In the Second Response, EPA granted Ameren's Request, in part, "with respect to the requested records and portions of records that contain only factual information not subject to

exemption under FOIA" and "with regard to some portions of the records because there are reasonably segregable, non-exempt portions of the records requested." *See* Exhibit 9 at 1.

**EPA Response**: Admitted.

      17.    In the Second Response, EPA denied the Request "with respect to the remaining records and information" requested by Ameren. *See* Exhibit 9 at 1.

**EPA Response**: Admitted.

      18.    In the Second Response, EPA asserted that Exemption 5 of FOIA permitted EPA to withhold certain documents and information responsive to Ameren's Request as attorney work-product privileged.  EPA's complete justification for such nondisclosure was as follows:

> "Exemption 5 of the FOIA protects from disclosure a record, or portion of a record, that is subject to the attorney work-product privilege.  The attorney work-product privilege protects documents prepared by, or at the direction of, an attorney in anticipation of litigation or during litigation.  The withheld documents and portions of documents were prepared by or at the direction of an attorney in anticipation of litigation.  Release of this material would allow scrutiny of EPA's sensitive litigation preparations.  Therefore, I have determined that the withheld material is exempt from disclosure under Exemption 5 of the FOIA."

*See* Exhibit 9 at 2.

**EPA Response**: EPA admits that it Exhibit 9 of Ameren's Statement of Facts contains one of the agency's responses to Ameren's FOIA request but denies the remainder of this paragraph.  EPA denies that this response was the only or "complete" justification provided by the agency for withholding documents, and refers Ameren to Exhibit H hereto, the declaration of Mr. Mark A. Smith, and its cross-motion for summary judgment as the "complete" justification for its FOIA decisions.

      19.    In the Second Response, EPA also asserted that Exemption 5 of FOIA permitted EPA to withhold certain documents and information responsive to Ameren's Request as attorney-client privileged.  EPA's complete justification for such nondisclosure was as follows:

> "Exemption 5 of the FOIA also protects from disclosure a record, or portion of a

record, that is subject to the attorney-client privilege.  The attorney-client privilege
protects confidential communications between an attorney and his/her client
relating to a legal matter for which the client has sought professional advice.  The
privilege applies to facts divulged by a client to the attorney, to opinions given by
the attorney to the client based upon those facts, and to communications between
attorneys which reflect client-supplied information.  The withheld documents and
portions of documents are protected by the attorney-client privilege because they
constitute communication between the attorneys and the client and
communication between attorneys relating to legal matters.  Release of this
withheld material would allow scrutiny of sensitive, confidential communication
between the attorneys and the client.  Therefore, I have determined that the
withheld material is exempt from disclosure under Exemption 5 of the FOIA."

*See* Exhibit 9 at 2.

**EPA Response**: EPA incorporates its response to ¶ 18 above.

20.     In the Second Response, EPA also asserted that Exemption 7(A), FOIA's law

enforcement exemption, of FOIA permitted EPA to withhold certain documents and information

responsive to Ameren's Request.  EPA's complete justification for such nondisclosure was as

follows:

"Exemption 7(A) of the FOIA, 5 U.S.C. § 552(b)(7)(A), protects from disclosure
'records or information compiled for law enforcement purposes, but only to the
extent that the production of such law enforcement records or information…could
reasonably be expected to interfere with enforcement proceedings.'  The withheld
documents and portions of documents consist of records and information
compiled for law enforcement purposes.  The documents were compiled by EPA
for the purpose of enforcing the Clean Air Act.  Further, the production of these
materials could reasonably be expected to interfere with ongoing enforcement
proceedings, because it would [sic] hinder the government's ability to control or
shape the current enforcement action

underway with regard to the Notices of Violation identified in your request, and would prematurely reveal the government's evidence or strategy in an ongoing enforcement action.  Therefore, I have determined that the withheld material is exempt from disclosure under Exemption 7(A) of the FOIA."  (ellipses in original).

*See* Exhibit 9 at 3.

**EPA Response**: EPA incorporates its response to ¶ 18 above.

21.     Pursuant to EPA's Second Response, on October 19, 2011, EPA produced to Ameren "with the reasonably segregable and non-exempt records that are responsive to [Ameren's] FOIA Request that [Ameren] submitted on July 1, 2011."  (hereinafter, the "Production).  *See* Exhibit 10 at 1.

**EPA Response**: Admitted.

22.     EPA stated that 275 documents were responsive to the Request.  *See* Exhibit 10 at 2.  Of the 275 documents, EPA produced 48 documents in their entirety, and 136 documents with various responsive data and information redacted.  *Id*.  EPA withheld the remaining 91 documents in their entirety.  *Id*.

**EPA Response**: Admitted.

23.     EPA did not provide a specific description of the responsive documents withheld or the responsive information that was redacted in either its Second Response or the Production, essentially adhering to the statutory language.  *See* Exhibit 9 and Exhibit 10.

**EPA Response**: EPA admits that Exhibit 9 provided Ameren with a description of what was produced and what was withheld under what legal authorities, but denies that the response by the EPA was deficient in any respect.  *See* Exhibit H hereto, the declaration of Mr. Mark Smith, and EPA's cross-motion for summary judgment and 40 C.F.R. § 2.104(h)

24.     In addition, EPA did not provide an index identifying the particular FOIA exemption upon which EPA based its determination to not disclose each responsive document or redact responsive information in any responsive document.  *See* Exhibit 9 and Exhibit 10.  EPA did not provide a *Vaughn* index that explained why each of the withheld documents or information within each of the documents, was protected from disclosure by Exemption 5, Exemption 7(A) or both.  *Id.*

**EPA Response**: EPA incorporates its response to ¶ 23 above.

25.     On October 31, 2011, Ameren requested that EPA "provide an itemized index of the withheld documents and information that adequately describes the withheld documents and deletions and explains for each item the exemption being applied."  *See* Exhibit 11 at 1.

**EPA Response**: Admitted.

26.     EPA denied Ameren's October 31, 2011, request by letter dated November 4, 2011.  *See* Exhibit 12.  EPA's explanation for not providing an index or description of the withheld or redacted documents or an explanation of the FOIA exemption applied to each document was as follows:

> By statute, the denial of an initial FOIA request must inform the requester of the reasons for the denial, the right to appeal, and the name and title of each person responsible for the denial. 5 U.S.C. §§ 552(a)(6)(A)(i) and 552(a)(6)(C)(i). EPA's FOIA regulations at 40 C.F.R. § 2.104(h) similarly provide that the agency's initial denial of a FOIA request must include the name and position of the person responsible for the denial, a brief statement of the reasons for the denial including an identification of the records being withheld and any FOIA exemptions applied, and an estimate of the volume of information withheld. This information was provided to you in the October 19, 2011 cover letter attached to the documents released to you in response to your appeal. EPA has met its statutory and regulatory obligations.
>
> *See id*. at 1.

9

**EPA Response**:  EPA admits that Exhibit 12 provided Ameren with a description of what was produced and what was withheld under what legal authorities, but denies that the response by the EPA was deficient in any respect.  *See* Exhibit H hereto, the declaration of Mark Smith, and EPA's cross-motion for summary judgment.

27.     In response, by letter dated November 18, 2011, Ameren again requested that:

In the interest of avoiding litigation, we again ask that EPA reconsider its refusal to provide an index, in any form, of withheld documents, so that [Ameren] may assess EPA's claims in an effort to narrow or dispose of this dispute. [Ameren] ask[s] that EPA provide a *Vaughn* index, or at a minimum a document-by-document and redaction-by-redaction explanation of what exemption EPA claims applies, and why.

*See* Exhibit 13 at 1.

**EPA Response**: EPA admits that Ameren has requested a Vaughn Index from EPA, but denies that the production of an Index is required in this case.  *See* Exhibit H hereto, the declaration of Mark Smith, and EPA's cross-motion for summary judgment.

28.     The non-redacted documents and non-redacted information that EPA provided to

Ameren in the Production are mostly comprised of the data and information that Ameren

previously provided to EPA in response to administrative information requests issued by EPA to

Ameren pursuant to Section 114(a) of the Clean Air Act ("CAA"), 42 U.S.C. § 7414(a).

("Information Requests").  *See* Exhibit 14.

**EPA Response**: Denied in part.  The information contained in Exhibit 14 was partially derived from Ameren's responses to the agency, but also contains the work product of agency enforcement staff.  *See* Exhibit H hereto, the declaration of Mark A. Smith, ¶¶ 11-13, 35-38.

29.     For example, Exhibit 15 is representative of the responsive information provided

and redacted by EPA.  EPA provided certain data, including, "Actual Emission Increases (tpy),"

"Heat Input mmBTU," "Heat Input 24 Mo Avg," "Net Gen MW hrs," and "Net Gen 24 Mo Avg."

*See* Exhibit 15 at 2, 15 – 52 (of pdf).  This data is based mostly upon actual emissions data and

Plant performance data that was originally in Ameren's possession and was provided by Ameren

to EPA in response to the Information Requests.  *Compare, e.g.*, Exhibit 15 at 15 (of pdf), with

Exhibit 14 at 3 (of pdf) (showing identical net generation data).  It is also a matter of public

record.  *See* EPA's Clean Air Markets Division website, *available at*

http://camddataandmaps.epa.gov/gdm/index.cfm?fuseaction=emissions.wizard.

**EPA Response**: EPA incorporates its response to ¶ 28 above.

30.     As depicted in Exhibit 15, EPA redacted the "Projected Actual Emission Increases

(tpy)" data (*see* Exhibit 15 at 2, 3 (of pdf)) and additional information (*see id*. at 8) from the

documents produced to Ameren in the Production.

**EPA Response**: EPA admits that it redacted certain privileged law enforcement information
from some documents produced to Ameren in response to the FOIA request under the FOIA
exemptions discussed in EPA's cross-motion for summary judgment.

31.     EPA's Second Response constitutes EPA's final determination and, therefore, is

subject to judicial review.  5 U.S.C. § 552(a)(4)(B).  *See* Exhibit 2 at ¶ 3.

**EPA Response**: Admitted in part.  EPA does not contest this Court's jurisdiction over the case,
but does contest Ameren's entitlement to additional records or information under FOIA.

32.     Ameren has exhausted its administrative remedies and this suit is ripe.

**EPA Response**: EPA incorporates its response to ¶ 31 above.

33.     As of the filing of this Motion for Summary Judgment, other than EPA's

statements identified herein, EPA has not provided Ameren with any additional documents or

information that justifies or substantiates EPA's decision to withhold documents and information

responsive to Ameren's Request.

**EPA Response**:  Denied in part.  EPA did not provide additional information because Ameren
refused to informally confer over these discovery issues before filing this lawsuit. On November
23, 2011, counsel for DOJ, on behalf of EPA, wrote an electronic mail to Ameren's counsel
offering to discuss Ameren's FOIA requests as part of the discovery planning for the underlying

enforcement action pending before Judge Sippel, advising Ameren that: "Based on our current understanding of Ms. Sullivan's FOIA request [on behalf of Ameren], we believe that the documents and information that Ms. Sullivan and Ameren seek will be addressed in due course during the litigation through either production or identification on a privilege log."  Ameren did not accept DOJ's invitation to confer over the FOIA issues as part of the underlying enforcement case.  Instead, on November 23, 2011, Ameren filed this lawsuit.

34.     In addition, acting on behalf of EPA, on January 12, 2011, the United States Department of Justice ("DOJ") filed a lawsuit against Ameren in the United States District Court for the Eastern District of Missouri (*U.S. v. Ameren Missouri*, Case No. 4:11-CV-0007-RWS) alleging violations of the CAA (hereinafter, the "Lawsuit").  *See* Exhibit 16.

**EPA Response**: Admitted.

35.     The Lawsuit is limited to a subset of projects identified in the NOVs that occurred at Ameren's Rush Island Plant between 2001 and 2010.  *See* Exhibit 16 at ¶¶ 63 - 74.  Ameren's three other coal-fired Missouri plants are not named.  *Id*.  DOJ filed an amended complaint on June 28, 2011 that added two more projects at Rush Island.  *See* Exhibit 17 at ¶¶ 77 - 86. Further, the Lawsuit only deals with one of five criterion pollutants – sulfur dioxide.  *See* Exhibit 17 at ¶¶ 65 – 86.  It does not allege CAA violations based on NOx, PM, ozone, and/or PM2.5, the other pollutants at issue in the NOVs.  *Compare id*. to Exhibit 5 at ¶ 58.  EPA has not withdrawn the NOVs related to Ameren's other alleged violations.

**EPA Response**: EPA admits that it has filed a complaint and an amended complaint in the pending CAA case which allege CAA violations.  EPA denies that NOVs can be "withdrawn" or that NOVs are final agency actions and EPA incorporates its response to ¶ 4 above.  EPA further denies that sulfur dioxide is the only air pollutant at issue in the pending CAA enforcement lawsuit.  Once emitted from a smokestack, sulfur dioxide transforms into fine particles (PM2.5), an air pollutant that contributes to premature mortality.  *See*, e.g., 76 Fed. Reg. 24,976, 25,085 (2011) ("The major health effect associated with reducing PM2.5 and PM2.5 precursors (such as SO2) is a reduction in premature mortality.")

## II.     EPA's Separate Statement of Undisputed Facts In Support of

**Its Cross-Motion for Summary Judgment.**

1.      Mark A. Smith is the Chief of the Air Permitting and Compliance Branch (APCO) of the Air and Waste Management Division, United States Environmental Protection Agency, Region 7 ("EPA Region 7").  He has held this position since October 2007.  Prior to that, upon joining EPA Region 7 in 1991, he worked in the Air Permitting Section and the Toxics Substances Control Section.  In 2000, he was named Branch Chief of the Underground Storage Tanks branch.  From 2002-2004, he served as EPA's lead region coordinator for Air, coordinating administrative, budget, policy and programmatic activities between the EPA Regional Offices and EPA Headquarters.  From 2004-2007, he served as the Branch Chief for the Chemical Risk Management Branch in Region 7.  *See* Exhibit H, Declaration of Mark Smith, ¶ 1.

2.      In the course of his duties as APCO Branch Chief, Mr. Smith supervises APCO staff.  APCO is responsible for all air permitting, enforcement and compliance activities under the Clean Air Act (CAA) in Iowa, Nebraska, Missouri and Kansas.  Among these law enforcement responsibilities, APCO conducts investigations of coal-fired power plants to evaluate their compliance with the New Source Review (NSR) and Prevention of Significant Deterioration (PSD) requirements of the CAA.  APCO also responds to requests submitted pursuant to the Freedom of Information Act (FOIA) seeking information related to APCO's responsibilities.  *See* Exhibit H, Declaration of Mark Smith, ¶ 2.

3.      In order for EPA to determine whether a project resulted in a "significant net emissions increase," under the CAA's PSD program, as implemented in the Missouri SIP, EPA compares baseline actual emissions prior to the project to projected actual emissions after the project.  Because the regulations require a projection of emissions from the source before the project is undertaken, in determining a source's compliance with PSD, EPA ascertains what information that source had available to it  before the project was undertaken to determine whether emissions would have been expected to increase as a result of the project.  In making these calculations and estimations, EPA considers all relevant information, such as historical operational data, the company's own representations, the company's projected business activity, the company's filings with the State or Federal regulatory authorities, and compliance plans under the approved SIP. *See* Exhibit H, Declaration of Mark Smith, ¶ 10.

4.      On March 11, 2008, EPA Region 7 issued an information request letter to Ameren (formerly known as AmerenUE and Union Electric) to gather information on projects undertaken by Ameren at its Labadie, Meramec, Rush Island, and Sioux coal-fired power plants from 1980 to the present.  The purpose of the request was to investigate the compliance status of Ameren with the CAA.  *See* Exhibit H, Declaration of Mark Smith, ¶ 11.

5.      Between July 2008 and February 2012, Ameren responded to this information request on a rolling basis, producing over 260,000 pages of documents.  In doing so, Ameren claimed that the vast majority of this material submitted to EPA should be considered Confidential Business Information (CBI).  *See* Exhibit H, Declaration of Mark Smith, ¶ 12.

6.      Since Ameren's claim of CBI, and because of EPA's general approach to CAA investigations, EPA Region 7 implemented measures to protect the confidentiality of Ameren's submitted information and preserve the integrity of the CAA investigation.  All of the information originally received from Ameren are stored in a locked file cabinet in the Regional Office, and the only persons with access to this information are those employees in APCO and in Region 7's Office of Regional Counsel that have specific employment duties that include investigation and prosecution of CAA cases.  EPA employees that are not involved with this investigation and do not have CAA enforcement responsibilities do not have access to this information.  In addition, all of the employees with access to this information have received extensive initial and ongoing refresher training on EPA's procedures regarding the handling of CBI and conducting CAA investigations and prosecutions.  Furthermore, any and all files created by EPA staff which include information claimed by Ameren as CBI are also subject to these protective measures.  *See* Exhibit H, Declaration of Mark Smith, ¶ 13.

7.      On January 26, 2010, EPA issued a Notice of Violation (NOV) to Ameren alleging violations of the PSD and Nonattainment New Source Review provisions of the CAA at all four of Ameren's coal-fired power plants in Missouri.  Included among the projects violating the CAA listed in the NOV are a project to replace the complete primary superheater at Rush Island Unit 1 with a modified and expanded component in 2001-2002, a project to replace the complete primary superheater at Rush Island Unit 2 with a modified and expanded component in 2003-2004, and a project to replace the economizer, reheater, lower slope tubes, air preheaters and associated turbine projects at Rush Island Unit 1 in 2007.  *See* Exhibit H, Declaration of Mark Smith, ¶ 14.

16

17

8. On October 14, 2010, EPA issued an amended Notice of Violation (Amended NOV) to Ameren to add an additional violation stemming from a project that Ameren conducted to replace the economizer and reheater at Rush Island Unit 2 in 2010. *See* Exhibit H, Declaration of Mark Smith, ¶ 15.

9. On behalf of EPA, the U.S. Department of Justice (DOJ) filed a civil judicial enforcement action against Ameren Missouri on January 12, 2011 in the United States District Court for the Eastern District of Missouri (*U.S. v. Ameren Missouri*, Case No.4:11-CV-00077-RWS) alleging violations of the CAA that occurred at Ameren's Rush Island Plant in 2001-2002 and 2003-2004. These alleged violations were included in the NOV and Amended NOV. *See* Exhibit H, Declaration of Mark Smith, ¶ 16.

10. On May 27, 2011, EPA issued a second amended NOV to make clear that the 2010 violation at Rush Island Unit 2 included a project to replace an air preheater and a turbine project associated with these boiler projects. *See* Exhibit H, Declaration of Mark Smith, ¶ 17.

11. On June 27, 2011, DOJ filed an Amended Complaint to add allegations of CAA violations at Rush Island Unit 1 in 2007 and at Rush Island Unit 2 in 2010. These violations were included in the NOV, Amended NOV, and Second Amended NOV. *See* Exhibit H, Declaration of Mark Smith, ¶ 18.

12. On January 27, 2012, Judge Sippel of the Eastern District of Missouri granted in part and denied in part Ameren's motion to dismiss EPA's Clean Air Act enforcement lawsuit. As a result of this ruling, both EPA and Ameren will soon be engaging in discovery with respect to the projects cited in the Amended Complaint at Rush Island. *See* Exhibit H, Declaration of Mark Smith, ¶ 20.

18

13.     On July 1, 2011, four days after the filing of the Amended Complaint in the pending CAA enforcement case, Ameren submitted a request to EPA under the Freedom of Information Act ("FOIA"), asking for all "documents and information that discuss or memorialize the emission calculations performed or used in connection with USEPA's findings that the physical changes or changes in the method of operation identified in the NOVs constituted major modifications that cause a significant emissions increase and a significant net emissions increase of sulfur dioxide, nitrogen oxide, particulate matter, particulate matter less than 2.5 micrometers in diameter and/or ozone." *See* Exhibit H, Declaration of Mark Smith, ¶ 21.

14.     EPA Region 7 maintained sole possession of the responsive records and implemented measures to protect the confidentiality of these records, which are outlined in paragraph 13 of Mr. Smith's Declaration, due to Ameren's claims that the information it had provided was protected CBI.  EPA Region 7 used the information provided by Ameren, as well as other relevant information, in preparing the calculations, documents and information related to the NOVs.  Therefore, all EPA Region 7 calculations, memoranda, and other documents that would be responsive to this request were also treated as CBI and subject to the protective measures described in paragraph 13 of Mr. Smith's declaration. After reviewing Ameren's FOIA request, EPA staff searched for and located the responsive records.  Following the location of these responsive records, EPA staff, in consultation with EPA Region 7's Office of Regional Counsel, reviewed the records to determine if they should be released in response to the FOIA request.  *See* Exhibit H, Declaration of Mark Smith, ¶ 22.

15.     On July 28, 2011, EPA denied Ameren's FOIA request because the documents

sought by Ameren are exempt from mandatory disclosure under the FOIA statues and regulations. FOIA exemption 5, found at 40 C.F.R. § 2.105(a)(5), applies to inter-agency or intra-agency memoranda or letters which would not be available by law to a party other than an agency in litigation with the affected agency. Exemption 7(A), from 40 C.F.R. § 2.105(a)(7)(A), applies to records or information compiled for law enforcement purposes, the production of which could reasonably be expected to interfere with enforcement proceedings. *See* Exhibit H, Declaration of Mark Smith, ¶ 23.

16.     As EPA explained in the July 28 response letter, Exemption 5 applies to this information because all of the documents in question were prepared at the time at the direction and under the supervision of EPA and/or DOJ attorneys in anticipation of litigation and are therefore attorney work-product. The documents in question also constitute attorney-client privileged communication. As EPA also explained, Exemption 7(A) applies because the documents in question were compiled for the enforcement purposes of investigating the compliance status of Ameren's facilities with the NSR requirements of the CAA. Because the documents in question contain confidential information, the release of which will prematurely reveal EPA's evidence or strategy in an ongoing case, the production of these documents would reasonably be expected to interfere with enforcement proceedings. *See* Exhibit H, Declaration of Mark Smith, ¶ 24.

17.     On August 16, 2011, Ameren filed an administrative appeal of EPA's denial of Ameren's FOIA request. As mandated by EPA's FOIA regulations, this appeal was handled by the Office of General Counsel (OGC) at EPA's Headquarters. *See* Exhibit H, Declaration of Mark Smith, ¶ 25.

20

18.    On September 16, 2011, EPA OGC granted Ameren's FOIA appeal in part, and denied it in part.  EPA Headquarters remanded the FOIA request to Region 7 to produce all reasonably segregable, non-FOIA exempt portions of all responsive records that Ameren requested.  With respect to all remaining records and information, EPA denied Ameren's appeal on several grounds.  First, EPA explained that these records were exempt from disclosure subject to FOIA exemption 5 because they constituted documents or portions of documents that were prepared by or at the direction of an attorney in anticipation of litigation.  Release of these materials would allow external scrutiny of EPA's sensitive litigation preparations.  Furthermore, these records constitute communication between the attorneys and the client and communication between attorneys relating to legal matters.  Release of the withheld material would allow scrutiny of sensitive, confidential communication between the attorneys and the client.  Second, these documents were subject to FOIA exemption 7(A) because they were compiled by EPA for the purpose of enforcing the CAA.  The production of these materials could reasonably be expected to interfere with ongoing enforcement proceedings, because it could hinder the government's ability to pursue the current enforcement action underway with regard to the NOVs identified in Ameren's FOIA request, and would prematurely reveal the government's evidence or strategy in an ongoing enforcement action.  *See* Exhibit H, Declaration of Mark Smith, ¶ 26.

19.    Following EPA Region 7's receipt of the appeal determination, Mr. Smith's staff undertook a document-by-document and line-by-line review to determine what information was reasonably segregable and releasable to Ameren.  *See* Exhibit H, Declaration of Mark Smith, ¶ 27.

20.    On October 19, 2011, in compliance with the appeal decision of EPA's Office of

21

General Counsel, EPA Region 7 provided to Ameren a disk which contained the reasonably

segregable

and non-exempt records that were responsive to Ameren's FOIA request.  *See* Exhibit H, Declaration of Mark Smith, ¶ 28.

21.     In searching for documents that were responsive to Ameren's FOIA request, EPA enforcement staff found approximately 275 documents.  For purposes of Mr. Smith's explanation, these documents can be placed into one of three categories: releasable; partially releasable (i.e., releasable with redactions); and privileged (i.e., withheld in their entirety).  *See* Exhibit H, Declaration of Mark Smith, ¶ 29.

22.     The first category includes files that were releasable in their entirety.  Generally speaking, these files include either: (a) spreadsheets with pure data (i.e., that involve no analyses or projections showing the internal judgments of EPA enforcement staff) of parameters such as Gross Load, Heat Input, and NOx rate; or (b) graphical depictions of these pure data.  EPA used these data as part of its internal calculations to determine the status of Ameren's compliance with the CAA.  Because these data come from sources that are available to the public, EPA views this information as releasable.  Approximately 41 documents fall into this category.  *See* Exhibit H, Declaration of Mark Smith, ¶ 30.

23.     An additional 7 documents were also deemed by EPA to be releasable because they contained "factual" information.  These constituted spreadsheets containing information obtained from Ameren as part of its response to EPA's information request.  They contain generation and outage data reported by Ameren to the Generating Availability Data System (GADS), maintained by the North American Electric Reliability Corporation.  Although this information was claimed by Ameren to be CBI, out of an abundance of caution EPA obtained permission from Ameren (through correspondence from Susan Knowles dated September 22,

2011) to release this information as part of the October 19 disk.  *See* Exhibit H, Declaration of Mark Smith, ¶ 31.

24.     A second category of documents produced to Ameren in the October 19, 2011 disk are documents that were released in part and redacted in part.  There are 136 documents that fall within this category.  EPA applied the redactions to these documents based on an application of FOIA exemptions 5 and 7(a).  Generally speaking, these redactions apply to the following types of documents:

- EPA's analysis of Ameren's emissions trends of $SO_2$, $NO_x$, and heat input at each of their power plants over time (52 documents);

- EPA's analysis of the data that Ameren reported to GADS (12 documents); and

- EPA's projections and estimations, using EPA enforcement staff's engineering judgment, of the projected emissions increases that would be expected as a result of the projects listed in the NOVs (72 documents).

In general, these documents were created by environmental engineers in EPA's enforcement staff under the direction and supervision of counsel and then shared with attorneys in EPA Region 7's Office of Regional Counsel and/or DOJ.  *See* Exhibit H, Declaration of Mark Smith, ¶ 32.

25.     The third and final category of documents pertaining to Ameren's FOIA are those that EPA withheld in their entirety pursuant to FOIA exemptions 5 and 7(A).  These privileged documents generally include memoranda and other documents written by EPA enforcement staff at the direction of EPA and/or DOJ attorneys.  These documents were prepared to support the issuance of the NOV and to refer the case to DOJ, and therefore were prepared in anticipation of litigation.  They include EPA staff's analysis of Ameren's compliance with the CAA for the projects listed in EPA's NOVs, based on their review of the information submitted by Ameren in

its information request response.  Approximately 91 documents fall into this category.  All of these documents were created prior to the issuance of the NOVs referenced in paragraphs 14 through 17 of Mr. Smith's Declaration and the filing of the Complaint in the CAA case against Ameren.  In general, these documents were created by environmental engineers and environmental scientists in EPA enforcement staff under the direction and supervision of counsel and then shared with attorneys in EPA Region 7's Office of Regional Counsel and/or DOJ.  *See* Exhibit H, Declaration of Mark Smith, ¶ 33.

26.     Factual information contained within the documents and memoranda withheld in their entirety was determined by EPA to be inextricably intertwined with the privileged information, and therefore could not be reasonably segregated to be released under FOIA from the attorney-work product, attorney-client, and law enforcement information.  *See* Exhibit H, Declaration of Mark Smith, ¶ 34.

27.     In order to explain why the records in question are entitled to protection under FOIA exemptions 5 and 7(A), it is helpful to provide some general background on the procedures EPA used to initiate a CAA compliance investigation into Ameren's coal-fired power plants, and how that led to the issuance of the NOVs and the filing of the civil judicial action in this District Court (*United States v. Ameren*, 4:11-cv-77-RWS).  EPA began its investigation into Ameren's compliance with the CAA (as it does with any other coal-fired utility) by using the information gathering authority granted to it by Section 114 of the CAA.  Among other things, these information requests seek information about the emissions units in question (design, production and modeling data), any projects above a certain expenditure level that were undertaken to modify each unit, emissions data from each unit before and after each project undertaken at the

unit, any CAA permitting documents that apply to the source at the emissions unit in question, and any emissions analyses prepared by the source to assess its compliance with PSD.  *See* Exhibit H, Declaration of Mark Smith, ¶¶ 35-36.

28.     After receipt of the information requested from Ameren, EPA enforcement staff reviewed Ameren's response and documents submitted by Ameren in assessing Ameren's compliance with the PSD requirements.  In doing so, EPA staff, under the direction of counsel and with periodic assistance from counsel, did a fact-specific analysis applying numerous factors and variables.  As part of this process, EPA staff also prepared memoranda to EPA attorneys documenting these findings and conclusions.  In this instance, EPA staff's screening level analysis of the data indicated that Ameren had violated the requirements of PSD with respect to a number of projects at its coal-fired power plants.  *See* Exhibit H, Declaration of Mark Smith, ¶ 37.

29.     EPA's assessment of each project's compliance with PSD is a fact-specific determination that hinges on many factors and variables involving a number of technical judgments.  Each determination also involves an understanding of the applicable statutory and regulatory provisions at issue as well as an application of those regulations to the facts as EPA finds them during its investigation.  For example, enforcement staff made factually and legally supported judgments about the specific variables and inputs to the emissions analyses and the applicability of PSD regulations, as discussed between EPA enforcement staff and EPA Region 7 attorneys.  The withheld documents in this case reveal this preliminary, screening-level analysis and show EPA's thought process and deliberations in anticipation of litigation with Ameren. Specifically, the withheld category of documents consists of preliminary, screening-level

emissions analyses prepared by EPA staff to determine whether Ameren should have expected emissions to increase as a result of one or more projects that were undertaken at an emissions unit.  In contrast to the pure data that is discussed in paragraph 30 of Mr. Smith's declaration, these spreadsheets are analyses prepared at the request of counsel and reflect a preliminary technical judgment by EPA engineers, based on the data and techniques available to them, as to the emissions increases Ameren should have expected after each project was completed and the unit returned to operation.  *See* Exhibit H, Declaration of Mark Smith, ¶ 38.

30.     Using this screening level emissions analysis and other available information, EPA issued a NOV to Ameren which included the projects that EPA staff identified as violations of the CAA.  *See* Exhibit H, Declaration of Mark Smith, ¶ 39.

31.     EPA Region 7 also used the enforcement staff's preliminary emissions analysis to support its decision to refer Ameren to the DOJ for possible civil judicial enforcement.  EPA enforcement staff's emissions analyses were performed at a "screening level" and at the direction and with the assistance of counsel, based on the information enforcement staff gathered during its investigation of Ameren and that it had available to it at the time.  These analyses were prepared to assist lawyers for EPA and DOJ in evaluating whether to initiate such an action against Ameren.  *See* Exhibit H, Declaration of Mark Smith, ¶ 40.

32.     EPA performs a law enforcement function by enforcing the provisions of the CAA, including the NSR and PSD requirements.  Documents created and information compiled for EPA's enforcement litigation - such as the documents in question in this lawsuit - are protected from disclosure under Exemption 7(A) if their release would interfere with the ongoing enforcement action.  *See* Exhibit H, Declaration of Mark Smith, ¶ 42.

27

33.     Requiring EPA to disclose the emissions analyses and accompanying legal conclusions through a FOIA request - especially when the requestor is the very same party whose CAA compliance EPA is currently investigating and with whom EPA is currently engaged in ongoing litigation on the same subject matter at one of the same facilities - would interfere with EPA's law enforcement investigation for several reasons.  It will allow Ameren, other utilities or other members of the public to pry into the agency's thoughts and mental impressions about the enforcement case.  In such a circumstance, Ameren (and potentially other utilities) will gain valuable internal and privileged information for use in the ongoing CAA litigation or other, yet to be filed litigation.  *See* Exhibit H, Declaration of Mark Smith, ¶ 43.

34.     In sum, the premature release of this information through FOIA would allow Ameren and other interested parties with undue insight into EPA's investigation of Ameren and the development of the enforcement case.  This insight could enable Ameren and other utilities to devise litigation strategies and/or avoid compliance with the CAA, impairing EPA's ability to ultimately present its case.  *See* Exhibit H, Declaration of Mark Smith, ¶ 44.

35.     FOIA exemption 5 protects from disclosure all inter-agency or intra-agency memoranda or letters which would not be available by law to a party other than an agency in litigation with the affected agency.  Exemption 5 also includes protection of documents that can be categorized as attorney work product.  Portions of 136 documents were redacted and withheld, and 91 other documents were withheld entirely under FOIA Exemption 5 for the attorney work product privilege.  Release of this confidential information contained in these documents would deprive EPA of the benefit of the confidential advice from attorneys concerning anticipated litigation and also deprive EPA attorneys of the ability to keep their thoughts and mental

28

impressions from being discovered by an opponent in litigation.  *See* Exhibit H, Declaration of

Mark Smith, ¶ 45.

36.     The analyses conducted by EPA staff into Ameren's compliance with the CAA

were conducted at the direction of EPA's and/or DOJ's attorneys in anticipation of litigation.

Litigation is currently pending on Ameren's alleged noncompliance with the CAA's PSD

requirements at its Rush Island coal-fired power plant.  And, litigation is reasonably anticipated

at Ameren's other coal-fired generating power plants in Missouri, based on EPA's ongoing

investigation.  With respect to the pending litigation and the investigation, one of the core

questions at issue is whether Ameren should have expected its multi-million dollar capital

projects to result in a significant net emissions increase, within the meaning of the PSD

regulations, of air pollutants and thereby trigger the requirements of PSD, based on the

information available at the time.   In order for EPA to answer this question, EPA enforcement

staff consults with attorneys on what the applicable regulations required at the time of the

projects.  The PSD regulations also require them to determine the generation and emissions that

should have been expected as a result of the project, when Ameren began the project, and to

consider other information that helps EPA estimate projected future actual emissions.  This

determination requires EPA enforcement staff and EPA and/or DOJ attorneys to apply their

judgment to determine whether facts, as gathered by EPA in its investigation, support a

conclusion that Ameren violated the law in effect at the time of the project.  *See* Exhibit H,

Declaration of Mark Smith, ¶ 46.

37.     All of these analyses require the selection and assessment of specific facts and

data and are based on the mental impressions of EPA and DOJ attorneys and EPA enforcement

staff working at these attorneys' direction.  These attorneys direct EPA staff to consider various factors to assist in refining their analysis, given these attorneys' understanding of the CAA statutes, regulations, and current case law.  These technical analyses formed the basis for the issuance of the NOVs to Ameren, as well as EPA and DOJ's decision to file a civil judicial complaint in this District Court.  *See* Exhibit H, Declaration of Mark Smith, ¶ 47.

38.     All of the withheld or redacted documents in question in this FOIA lawsuit were created by EPA employees and have not been transmitted outside of EPA, except for a number of documents transmitted to the DOJ attorneys representing EPA in this enforcement matter in accordance with DOJ's statutory authority to represent EPA in such matters and consistent with EPA's CAA-specific CBI regulations.  These documents are subject to protective measures at EPA and have been treated as CBI, and access to these documents is restricted to the EPA attorneys and enforcement engineers working on this enforcement matter.  *See* Exhibit H, Declaration of Mark Smith, ¶ 48.

39.     Each of the documents EPA is withholding pursuant to Exemption 5 under the attorney work product doctrine has been reviewed to ensure that all reasonably segregable factual information has already been released to Ameren. *See* Exhibit H, Declaration of Mark Smith, ¶ 49.

40.     FOIA exemption 5 also protects from disclosure all documents that can be categorized as attorney-client privileged.  Portions of 136 documents were redacted and withheld, and 91 other documents were withheld entirely under FOIA Exemption 5 for the attorney-client privilege.  The disclosure of such communications would deprive EPA staff, and the agency in general, of the benefit of confidential advice from EPA and/or DOJ attorneys.  *See* Exhibit H,

Declaration of Mark Smith, ¶ 50.

41.     EPA staff and Mr. Smith work very closely with EPA and DOJ attorneys with regard to CAA power plant enforcement.  EPA attorneys provide legal advice to program staff and managers concerning the interpretation of the CAA and implementing regulations.  They also advise EPA staff and Mr. Smith on recent changes to the law and the preparation of internal deliberative materials, such as the spreadsheets and memoranda in question in this case.  They also frequently review and comment on these documents to ensure that all appropriate legal issues have been considered in EPA staff's analyses.  Many of these materials are used in preparation of the referral report from EPA to DOJ, in formulating the NOVs that were issued to Ameren, and in supporting the decision of whether to file a complaint against Ameren.  *See* Exhibit H, Declaration of Mark Smith, ¶ 51.

42.     Each of the documents EPA is withholding or redacting pursuant to Exemption 5, attorney-client privilege, has been reviewed to ensure that all reasonably segregable information has already been released to Ameren.  The withheld and redacted documents that are the subject of this FOIA lawsuit have never been shared outside of EPA, except for a number of documents transmitted to the DOJ attorneys representing EPA in this enforcement matter in accordance with DOJ's statutory authority to represent EPA in such matters and consistent with EPA's CAA-specific CBI regulations.  Moreover, the withheld documents will not be offered into evidence in court to support EPA's prima facie case or to rebut an affirmative defense in the pending CAA enforcement case.  The withheld documents represent a form of screening level emissions analysis to support the issuance of a NOV and referral of the case to DOJ for review and determination of whether a civil enforcement case will be filed.  *See* Exhibit H, Declaration of Mark Smith, ¶ 52.

32

Respectfully Submitted,

RICHARD G. CALLAHAN
United States Attorney

 /s/ Andrew J. Lay
Andrew J. Lay #28542
Suzanne J. Moore #49119
Assistant United States Attorneys
United States Attorney's Office
111 South Tenth Street, Room 20.333
Telephone: (314) 539-2200
Tele-fax: (314) 539-2777


Attorneys for Plaintiff,
the United States of America

<u>CERTIFICATE OF SERVICE</u>
       I hereby certify that on March 5, 2012, I electronically filed the foregoing pleading with
the Clerk of Court using the CM/ECF system, which will cause an electronic copy to be served
on counsel of record, who are listed below:

       Ronald S. Safer (pro hac vice)
       Patricia Brown Holmes (pro hac vice)
       Renee Cipriano (pro hac vice)
       Steven J. Bonebrake (pro hac vice)
       Matthew B. Mock (pro hac vice)
       Schiff Hardin LLP
       233 South Wacker Drive Suite 6600
       Chicago, Illinois 60606
       Phone: (312) 258-5500
       Fax: (312) 258-5600

       James J. Virtel
       Armstrong Teasdale LLP
       7700 Forsyth Boulevard Suite 1800
       St. Louis, Missouri  63105
       Phone: (314) 621-5070
       Fax: (314) 612-2298
       jvirtel@armstrongteasdale.com

       Attorneys for Ameren Missouri

                                                    /s/ Andrew J. Lay